The STATE of Ohio, Appellee,

v.

CRAGER, Appellant.

[Cite as *State v. Crager*, 164 Ohio App.3d 816, 2005-Ohio-6868.]

Court of Appeals of Ohio,
Third District, Marion County.

No. 9–04–54.

Decided Dec. 27, 2005.

Kevin P. Collins, for appellant.

Jim Slagle, Marion County Prosecuting Attorney, for appellee.

ROGERS, Judge.

{¶ 1} Defendant-appellant, Lee Crager, appeals the judgment of the Marion County Court of Common Pleas, sentencing him upon his convictions for aggravated murder and aggravated burglary. On appeal, Crager contends that the trial court erred in denying his motion to continue; that the trial court erred by admitting the report of DNA analyst Jennifer Duvall and in allowing DNA analyst Steve Wiechman to testify to the conclusions of Duvall's report; that he was denied his constitutional right to effective assistance of legal counsel; and

that the trial court erred in considering facts not found by the jury during sentencing in violation of *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. Upon review of the record, we find that Duvall's report should not have been admitted under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and that Wiechman did not have personal knowledge of the actual DNA tests performed in this case. Accordingly, we sustain Crager's second assignment of error and reverse the judgment of the trial court.

{¶ 2} On the evening of April 10, 2004, the body of Esta Boyd, an elderly woman, was found lying face down on her bed in a large pool of blood. The victim was found by her daughter-in-law, Cindy Boyd, who had come to check on Boyd. Immediately after finding the victim's body, Cindy contacted the Marion city police. Upon arrival, the police found the victim lying on her bed with her housecoat above her waist. Pieces of dark colored glass surrounded the bed. Additionally, blood was found above the headboard, on the walls next to the bed, and on the victim's pillowcase and sheets. Blood had also soaked into the mattress. Finally, a bloody sheet was found on the floor near the foot of the bed, and the victim's dentures were found on the floor next to the bed.

{¶ 3} An autopsy was performed on the victim's body. The autopsy revealed that the victim had suffered a series of wounds to the head and face, that the frenum of her lip was torn, that she had extensive hemorrhaging in her arms, that pieces of dark-colored glass were imbedded into her skin, and that she had a wound to her forearm and left hand. The autopsy did not reveal any signs of sexual assault. The cause of death was determined to be a blunt trauma to the head as well as arterial cardiovascular disease. Finally, the autopsy revealed that the victim had been dead for two to four days prior to being found.

{¶ 4} The victim was a 70–year–old resident of Marion, Ohio, who had lived in her home for 40 years. Because of a stroke, the victim did not get around well and spent a lot of time in bed. Nevertheless, she was known as a friendly and sociable person who hosted many visitors at her residence. When she received visitors, the victim would socialize either in the kitchen or in her bedroom, where she had a chair for them. While the victim lived alone in the main area of her residence, there was an upstairs apartment, as well as an efficiency apartment, attached to her house.

{¶ 5} When the police arrived following Cindy Boyd's call, they found a pack of cigarettes and an ashtray containing partially smoked cigarettes by the chair in the victim's bedroom. Additionally, an empty 16–ounce Old Milwaukee's Best beer can was found on the victim's nightstand, another empty beer can was found on the coffee table in the living room, and four empty beer cans and an empty whiskey bottle were found in the trash can on the back porch. The police seized

all of the above items for analysis, and each was tested for fingerprints. The only identifiable print was found on one of the beer cans found in the trash. That print belonged to Lee Crager.

{¶ 6} The police also found a cordless phone on the floor next to the chair in the victim's bedroom. An examination of the caller I.D. showed an incoming call from Richard Crager at 8:42 p.m. on April 7, 2004. Richard Crager was romantically involved with the victim and was a former tenant. He is the father of the defendant, Lee Crager.

{¶ 7} Additionally, the police were able to find, by pressing the redial function, that the last number called was to the Marion Area Counseling Center. Records from the phone company showed that several calls were placed from the victim's phone to "phone sex" numbers on April 8, 2004, at 3:51 a.m., 10:04 a.m., 1:06 p.m., and 1:08 p.m. Finally, the cordless phone was tested for fingerprints; however, no identifiable prints were found on the phone.

{¶ 8} Two palm prints were recovered from a mirror·in the victim's bedroom. Those prints belonged to Lee Crager.

{¶ 9} During their investigation, the police determined that the last time the victim was seen alive was on the night of April 7, 2004. Cindy Boyd, who had found the body, stated that she had last seen the victim alive on April 7, 2004, at approximately 3:45 p.m. or 4:00 p.m. Kelly Mulvaine, who cleaned the efficiency apartment, remembered hearing the victim's voice while she was cleaning at approximately 6:00 p.m. on April 7. Additionally, she had answered a phone call from the victim at approximately 8:44 p.m. on April 7. Tim Loper stated that he called the victim about renting the efficiency apartment on April 7, at approximately 7:30 p.m. or 8:00 p.m. He testified that when he called the victim, she stated that "she was sitting there talking to Lee." Loper understood this to mean Lee Crager. Finally, Loper stated that he had seen Lee Crager walking down the street towards the victim's house with a bag in his hand.

{¶ 10} The following day, April 8, 2004, the victim failed to show up for her weekly hair appointment. Sharon Callahan, the victim's hair dresser of 37 years, testified that the victim rarely missed her hair appointments. Kenneth Smith, who wanted to buy a car from the victim, testified that he had stopped by her house the afternoon of April 8 and that the victim did not answer the door. On April 9, 2004, John Martin, a florist, testified that he delivered flowers to the victim's home. He stated that he knocked on the door, but no one answered.

{¶ 11} Based on Loper's phone call with the victim, Lee Crager became a suspect in her case. Upon further investigation, the police determined that Crager had checked into the Marion Homeless Shelter at approximately 3:00 p.m. on April 6, 2004. He went to the Marion Area Counseling Center on the morning

of April 7. At approximately 4:30 p.m., Crager returned to the shelter; however, he did not stay at the shelter on the night of April 7.

{¶ 12} At approximately noon on April 8, Crager called the Marion Area Counseling Center to set up an appointment for approximately 3:00 p.m.; however, he did not keep that appointment. Later that night, Crager was arrested for not paying his tab at a local restaurant. At the time of his arrest, the police noticed blood on Crager's jeans and knuckles. The police collected Crager's clothes and submitted them for analysis. The police also observed several scratch marks on Crager's arms.

{¶ 13} Subsequent testing identified the substance on Crager's clothing as blood. Additionally, DNA testing of Crager's jeans and a shirt showed a mixture of profiles, which were identified as being consistent with Crager's and the victim's. DNA testing of a ring worn by the victim also showed a mixture of profiles, which were identified as being consistent with Crager's and the victim's. Finally, DNA testing on three cigarettes found in the victim's bedroom showed a mixture of profiles, which were identified as being consistent with Crager's and the victim's.

{¶ 14} In May 2004, Crager was indicted for one count of aggravated murder in violation of R.C. 2903.01(B)(2), a felony of the first degree, one count of murder in violation of R.C. 2903.02(B), a felony of the first degree, and one count of aggravated burglary in violation of R.C. 2911.05(A), a felony of the first degree.

{¶ 15} The matter was originally set for trial on July 6, 2004. In July 2004, the trial court granted Crager's motion to continue, and the matter was continued to September 13, 2004. On September 7, 2004, in an oral motion before the trial court, Crager again asked the trial court that the trial be continued. On September 9, 2004, Crager filed a written motion to continue, claiming that he was not prepared for trial and that his investigator was attempting to find a witness who may have been involved in the murder. The trial court denied both Crager's oral and written motions. On September 10, 2004, Crager filed an amended/supplemental motion to continue. The amended motion contained an affidavit from his investigator, stating that he was attempting to locate a possible alibi witness, who might have been in Toronto, Canada. The trial court again denied Crager's motion to continue. Finally, on the morning of trial, Crager's counsel put on the record a continuing objection to the trial being held, stating that he had insufficient time to prepare for Crager's trial. Crager's motion was denied.

{¶ 16} At trial, the state presented 44 witnesses; the defense did not present any witnesses. On September 16, 2004, the jury found Crager guilty on all three counts of the indictment. Subsequently, the trial court found that aggravated murder and murder were allied offenses. The trial court entered judgments of

guilty for aggravated murder and aggravated burglary; however, no conviction was entered for the second count, murder.

{¶ 17} In September 2004, Crager was sentenced upon the above convictions. It is from this judgment that Crager appeals, presenting the following assignments of error for our review.

## Assignment of Error No. I

The trial court erred to the prejudice of defendant-appellant by denying his motion to continue the trial.

## Assignment of Error No. II

The trial court erred to the prejudice of defendant-appellant by admitting the report of Jennifer Duvall and permitting Steve Wiechman to testify regarding the DNA testing performed by Jennifer Duvall.

## Assignment of Error No. III

Defendant-appellant received prejudicially ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights, as well as his rights under Section 10, Article I, Ohio Constitution.

## Assignment of Error No. IV

The trial court abused its discretion and violated the Constitution of the United States when it sentenced defendant-appellant based on findings not reflected in the jury's verdict or admitted by defendant-appellant.

{¶ 18} Due to the nature of the assignments of error, we choose to address them out of order.

## Assignment of Error No. II

{¶ 19} In the second assignment of error, Crager asserts that the trial court erred in admitting the report of DNA analyst Jennifer Duvall when she did not testify at trial. Additionally, Crager asserts that the trial court erred in allowing Steve Wiechman to testify to Duvall's report.

{¶ 20} During the course of the investigation in this case, approximately 39 pieces of evidence were sent to the Ohio Bureau of Criminal Identification and Investigation ("BCI") in London, Ohio. At BCI, Jennifer Duvall, a forensic scientist, analyzed several of the items submitted. Following her analysis of those items, Duvall prepared a report detailing her findings.

{¶ 21} On July 9, 2004, the state provided supplemental discovery stating that Steve Wiechman would be testifying in the place of Duvall. Wiechman was

testifying on Duvall's behalf because Duvall was scheduled to be on maternity leave during the time of Crager's trial. Crager filed no objection to the state's supplemental-discovery notice.

{¶ 22} At trial, however, Crager did object to Wiechman's testifying in place of Duvall. Specifically, Crager argued that Duvall's report was hearsay, since Wiechman did not perform the testing in this case. In response, the state argued that Wiechman did have personal knowledge of the results of the items tested in this case because he had done a technical analysis on those items. Additionally, the state argued that Duvall's report should be admitted under the business-records exception to the hearsay rule. Following counsels' arguments, the trial court overruled Crager's objection, allowing Wiechman to testify to his work in this case as well as to Duvall's report.

{¶ 23} In *Crawford v. Washington,* 541 U.S. at 38, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court recently addressed an issue involving the Confrontation Clause of the Sixth Amendment, which states, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed under a de novo standard. *United States v. Robinson* (C.A.6, 2004), 389 F.3d 582, 592.

{¶ 24} In *Crawford,* the defendant's wife, exercising her marital privilege, did not testify at his trial. *Crawford,* 541 U.S. at 40, 124 S.Ct. 1354, 158 L.Ed.2d 177. Before trial, however, in a tape-recorded statement to police, defendant's wife described the stabbing with which her husband was charged. Id. at 39, 124 S.Ct. 1354, 158 L.Ed.2d 177. The statement conflicted with defendant's claim that the stabbing was in self-defense. Id. Defendant argued that the wife's statement was not only inadmissible hearsay, but violated his Sixth Amendment right of confrontation. Id. at 40, 124 S.Ct. 1354, 158 L.Ed.2d 177. The trial court determined that the statement, though hearsay, was reliable and trustworthy, and the jury was allowed to hear it. Id. Defendant was subsequently convicted. Id. at 41, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 25} On appeal, the United States Supreme Court scrutinized the reliability of the wife's testimonial hearsay statement under the Confrontation Clause. Id. at 42–50, 124 S.Ct. 1354, 158 L.Ed.2d 177. The court went on to conclude, "Where *testimonial* statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (Emphasis added.) Id. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. Accordingly, the court held that where testimonial evidence is at issue, the Constitution requires unavailability and a prior opportunity for cross-examination. Id.

{¶ 26} While the court determined that unavailability and prior cross-examination were required for testimonial evidence, the court also found that "[w]here *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." (Emphasis added.) Id. Accordingly, the court held that with nontestimonial hearsay, the reliability test of *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, still applies.

{¶ 27} Finally, while the court in *Crawford* did not "spell out a comprehensive definition of 'testimonial,'" it did give the following examples of what may be included as testimonial statements:

'[E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' 'extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'

541 U.S. at 68, 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177. (Citations omitted.)

{¶ 28} Thus, under *Crawford*, the first issue is whether the testimony is testimonial or nontestimonial. While the court did not specifically define "testimonial," the above examples show that statements made during a police investigation or court proceedings will qualify as testimonial. *U.S. v. Cromer* (C.A.6, 2004), 389 F.3d 662, 672–73. Additionally, it seems that statements made under circumstances that would lead a reasonable person to conclude that such statements would later be available for use at trial also qualify as testimonial under *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177; see, also, *Cromer*, 389 F.3d at 673.

{¶ 29} Here, Duvall's report is clearly hearsay. Additionally, we find that Duvall's report is testimonial as defined by *Crawford*. First, Duvall's report was prepared as part of a police investigation, and, second, a reasonable person could conclude that the report would later be available for use at a trial. Accordingly, having found that Duvall's report is testimonial, such evidence is admissible only when there is unavailability *and* a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. As the Supreme Court noted in *Crawford*, "[W]e impose an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine* * *." Id. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 30} Because Crager was never given a prior opportunity to cross-examine Duvall about her findings in her report, we must find that Crager's Sixth Amendment right to confrontation was violated.

{¶ 31} While we have found that Duvall's report is testimonial evidence under *Crawford*, and therefore that Crager must be given a right to actual confrontation, we find it necessary to respond to the way in which other jurisdictions have dealt with similar issues. Several other jurisdictions, which have addressed similar *Crawford* challenges, have relied upon a strict interpretation of the Supreme Court's language in *Crawford*. See *Luginbyhl v. Commonwealth* (2005), 46 Va.App. 460, 618 S.E.2d 347 (a breath-test result does not constitute hearsay; therefore, the Sixth Amendment right to confrontation was not implicated); *Moreno Denoso v. State* (Tex.App.2005), 156 S.W.3d 166 (an autopsy report does not fall within the categories specifically enumerated by *Crawford*, including prior testimony at a preliminary hearing, before a grand jury or at a former trial); *State v. Dedman* (2004), 136 N.M. 561, 102 P.3d 628 (a blood-alcohol report was not testimonial because it did not fall within the categories of testimony specifically enumerated by *Crawford* and because the test was not prepared by law enforcement personnel); *People v. Johnson* (2004), 121 Cal.App.4th 1409, 18 Cal.Rptr.3d 230 (a lab report was not testimonial because the text of the Sixth Amendment applies only to live witness testimony).

{¶ 32} In addition to the above cases, New York, Massachusetts, and Colorado have taken a slightly different approach. *People v. Brown* (2005), 9 Misc.3d 420, 801 N.Y.S.2d 709; *People v. Durio* (2005), 7 Misc.3d 729, 794 N.Y.S.2d 863; *Commonwealth v. Verde* (2005), 444 Mass. 279, 827 N.E.2d 701; *People v. Hinojos–Mendoza* (2005), —— P.3d ——, 2005 WL 2561391. The New York, Massachusetts, and Colorado courts have each relied upon the following statement made in *Crawford*:

> Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony.

541 U.S. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 33} The New York, Massachusetts, and Colorado courts have each held that based upon the above statement, a *Crawford* analysis is inapplicable when business records are at issue. *Brown*, 9 Misc.3d at 424, 801 N.Y.S.2d 709; *Durio*, 7 Misc.3d at 734, 794 N.Y.S.2d 863; *Verde*, 444 Mass. at 283, 827 N.E.2d 701; *Hinojos–Mendoza* (2005), —— P.3d ——, 2005 WL 2561391. Thus, because lab reports similar to the type of lab reports at issue in this case are business records, these courts have held that *Crawford* is inapplicable to such reports. Id.

{¶ 34} While we acknowledge the above statement in *Crawford*, we do not find it controlling. First, the statement is purely dictum, as it was made during the majority's historical delineation of the Sixth Amendment right to confrontation. Thus, we do not find that such a statement should control over the court's holding, which involves whether a statement is testimonial or nontestimonial.

{¶ 35} Secondly, upon review of the business-records exception and the applicable case law surrounding the issue, we find that while some evidence may fall within the general business-records exception, other business records should nonetheless be subject to a *Crawford* analysis and be excluded from evidence thereunder because they are in fact testimonial.

{¶ 36} The Ohio business-records exception is embodied in Evid.R. 803. Evid.R. 803 provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶ 37} Lab reports and DNA reports prepared by BCI are generally prepared and kept in the course of a regularly conducted business. Such reports, however, are prepared wholly in anticipation of litigation. As such, while these reports fall within the general perimeter of the business-records exception, we hold that the fact that these reports are prepared solely for prosecution makes them testimonial.

{¶ 38} In *State v. Fontenette* (Sept. 19, 1991), 8th Dist. No. 59014, 1991 WL 184324, the defendant asserted that his constitutional right to confrontation had been violated when a DNA analyst, who testified at his trial, had not actually conducted the DNA testing. Id. There, the Eighth District found that the defendant had not been denied his right to confrontation because the DNA reports were properly admitted under the business-records exception to the hearsay rule, pursuant to Evid.R. 803(6). Id. In contrast, in addressing a

similar issue, the First District in *State v. Lane* (1995), 108 Ohio App.3d 477, 488, 671 N.E.2d 272, held that such records were subject to a Sixth Amendment right to confrontation. Both *Fontenette* and *Lane* predate *Crawford.*

{¶ 39} Additionally, we note that the Ohio Supreme Court has previously recognized that "a criminal defendant's constitutional rights limit the applicability of civil rules of evidence to a criminal case." *State v. Spikes* (1981), 67 Ohio St.2d 405, 408, 21 O.O.3d 254, 423 N.E.2d 1122, citing *State v. Tims* (1967), 9 Ohio St.2d 136, 38 O.O.2d 328, 224 N.E.2d 348. In *Tims,* the Ohio Supreme Court held, "The Business Records as Evidence Act, Section 2317.40, Revised Code, which allows the admission into evidence of records without substantiation by the person who actually performed the acts which resulted in such record, is not applicable to criminal proceedings so as to allow the admission into evidence under such act of hospital records showing the results of a physical examination of an alleged rape victim." 9 Ohio St.2d 136, 38 O.O.2d 328, 224 N.E.2d 348, syllabus.

{¶ 40} While *Tims* was overruled in part by *Spikes,* we find its underlying reasoning, which was based on a defendant's right to confrontation, to be instructive in this case. Specifically, the Ohio Supreme Court noted, "Expediency is the reason for the Business Records as Evidence Act, but expediency is not a sound ground upon which a denial of a constitutional right may be based." Id. at 138, 224 N.E.2d 348. Additionally, the Ohio Supreme Court stated:

> One of the basic and fundamental rights guaranteed an accused by both the state and federal Constitutions is the confrontation of the witnesses against him. Section 10, Article I of the Ohio Constitution, provides that an accused has a right "to meet the witnesses face to face." As was said in *Pointer v. State of Texas:* "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law."

Id., citing *Pointer v. Texas* (1965), 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923. (Citations omitted.) Finally, the Ohio Supreme Court noted that the "right to confrontation includes the right of cross-examination of the person who is the actual witness against him." *Tims,* 9 Ohio St.2d at 138, 224 N.E.2d 348.

{¶ 41} Thus, while other Ohio appellate courts, as well as courts in other jurisdictions, have found that business records per se do not fall within the Sixth Amendment right to confrontation, we cannot endorse such a broad rule. Again, under *Crawford,* the fundamental inquiry is whether a statement is testimonial or

nontestimonial. Thus, although some courts have found that lab reports are per se excluded from a *Crawford* examination because they fall within the business-records exception, we cannot join in this conclusion. Rather, when one's Sixth Amendment right to confrontation is at issue, we find that there must be a case-by-case determination as to whether such testimony or evidence is testimonial under *Crawford*. When such testimony or evidence is testimonial, a defendant must be afforded his right to confrontation, as set forth in *Crawford*.

{¶ 42} Accordingly, having found that Duvall's report is testimonial, we find that such evidence is admissible only when there is unavailability *and* a prior opportunity for cross examination. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. As the Supreme Court noted in *Crawford*, "we impose an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine * * *." Id. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 43} Because Crager was never given a prior opportunity to cross examine Duvall about her findings in her report, we must find that Crager's Sixth Amendment right to confrontation was violated.

{¶ 44} Finding that Duvall's report is testimonial under *Crawford* and that Crager was not afforded the opportunity to cross-examine Duvall as to the results of her report, the trial court's admission of this evidence was error under the Sixth Amendment.

■ {¶ 45} While Duvall's report should not have been admitted, Wiechman was able to testify to matters of which he did have personal knowledge. At trial, Wiechman testified that he, too, was a forensic scientist at BCI. In addition, he stated that in the victim's case, he performed a technical check on Duvall's work. Wiechman described the technical check as follows:

> Once a case is completed by an analyst it is actually gone through two review processes. One is a technical review process, and the other is an administrative process. With regards to the technical review, another qualified analyst would actually check the work of the another analyst to determine whether they followed all the correct procedures, whether they agree with their case approach, anything that the analyst did, another analyst would look at and would have to agree with, and then in turn sign off on that particular case.

{¶ 46} Wiechman went on to state that he performed the technical review of Duvall's work in this case. When asked what his technical review involved in this case, Wiechman stated that he looked over her case notes, that he looked over the actual profile she generated on the specific unknowns, and that he looked over her conclusions. He then went on to state that he "reviewed [those things] and made sure that the decisions or the conclusions by her work that she came up with were consistent and were supported by her work that she did."

{¶ 47} Wiechman then went on to testify to the conclusions in Duvall's report. Specifically, Duvall's DNA report revealed that Crager's jeans and a shirt showed a mixture of profiles that were identified as being consistent with Crager's and the victim's; that the ring worn by the victim also showed a mixture of profiles that were identified as being consistent with Crager's and the victim's; and that three cigarettes found in the victim's bedroom showed a mixture of profiles that were identified as being consistent with Crager's and the victim's.

{¶ 48} While the state properly asserts that Wiechman did have some "personal knowledge" in this case, we find that he had personal knowledge only of findings in Duvall's report. Based on his testimony, we cannot determine whether he did any independent testing on his own. While he did perform the technical review of Duvall's work in this case, it seems that review merely involved checking her notes, to make sure that she followed correct procedures and came to a reasonable conclusion. He did not observe or supervise her work. For the purposes of trial, we cannot find that this qualifies Wiechman to testify to the conclusions of Duvall's report when that report could not have been admitted into evidence.

{¶ 49} Additionally, throughout Wiechman's testimony, the DNA conclusions he gives come solely from Duvall's report, which should not have been admitted into evidence. Accordingly, we find that Wiechman's testimony as to the conclusions in Duvall's report was error because he did not have personal knowledge of the actual DNA testing process in this case.

{¶ 50} Removing the DNA evidence from this case would have a great impact on the determination of Crager's guilt or innocence. Upon review of the record, we note that without the DNA evidence, the state did present strong circumstantial evidence linking Crager to the crime, including his being placed at the victim's house prior to her being murdered and his fingerprints being found on the items at the crime scene. However, evidence was also presented showing that Crager did know the victim and that she had been romantically involved with his father. While the jury could draw an inference from the strong circumstantial evidence presented by the state, we cannot find that those inferences were certain. Accordingly, we conclude the trial court erred in allowing Duvall's report, as well as the DNA testimony of Wiechman concerning the conclusions in that report, and find that such error was prejudicial because we cannot say that the outcome of the trial without the DNA evidence would clearly have remained the same.[1]

{¶ 51} Thus, the second assignment of error is sustained.

---

1. We note that Crager did not object to the introduction of Duvall's actual report. However, even if we were to review this issue under a plain-error analysis, we would reach the same conclusion.

## Assignments of Error Nos. I, III, and IV

{¶ 52} In the first assignment of error, Crager asserts that the trial court erred in denying his motion to continue the trial. In the third assignment of error, Crager asserts that he was denied his right to effective assistance of counsel. In the fourth assignment of error, Crager contends that the trial court violated his right to a trial by jury when it imposed a prison term upon him based on findings not admitted by him or submitted to a jury. Based on the foregoing, it is unnecessary for this court to address the remaining assignments of error. Pursuant to App.R. 12(A)(1)(c), assignments of error one, three, and four have been rendered moot.

{¶ 53} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BRYANT and SHAW, JJ., concur.